All right. May it please the court, my name is Susan Andorfer and I represent the plaintiff appellant Nadine Hemminghaus in this case. Ms. Hemminghaus worked as a court reporter for the State of Missouri under the supervision of Judge Gary Gertner, who was a circuit judge. She has two claims I want to talk about. Her claim under the Family and Medical Leave Act first, which is against the State of Missouri. Under the FMLA, an employee is defined as any individual employed by a state other than such individual who is selected by the holder of a public elective office to be a member of his personal staff. So the first question is whether Judge Gertner held a public elective office such that he or a member of his personal staff would be exempt from protection under the FMLA. And I submit that he did not hold a public elective office for several reasons. First of all, under the Missouri Nonpartisan Court Plan, he was appointed to the bench by the governor. He was not elected or chosen by the public. He was only subject to retention elections, so he had no opponent in any election. Until his first retention election, he served his tenure without any review by the public whatsoever. If a judge is not... Does that mean, does that mean if he has no office and there's no opposition, that he's not an elected official? No, it doesn't, Your Honor. He would still... So what does it add that you don't have an opposition? It adds the fact that there could have been people to run against the governor, so there was an opportunity among the public, anybody from the public could have run against the governor, and they chose not to do so. With retention elections, nobody even has a choice to run against the judge. He was the only person on the ballot, so the public does not even get an opportunity. If I wanted to run against the governor, I would not have... I could have done that. With a judge, I could not have run against the judge in a retention election. Judge Gertner admitted that he did absolutely nothing for his retention elections. He did no campaigning. He raised no campaign funds. He hired no campaign staff as a truly publicly elected official would do. As you're aware, this is an issue of first impression. The Voting Rights Act cases that were cited by the district court, I think, are distinguishable. The Voting Rights Act employs an expansive definition of election, and the courts have held that it is to be construed in the broadest scope possible in order to combat racial discrimination. Those cases only hold that retention elections are elections for purposes of the Voting Rights Act. The term public elective office should be construed narrowly for purposes of the Family Medical Leave Act to have the broadest application to affect the remedial purposes of that Act. Courts, including this court, have held that the personal staff exception in that term is to be construed narrowly against the employer. It would be illogical to have the public elective office holder term be interpreted broadly, but then have the personal staff term or exception be construed narrowly, especially when they're in the same particular subsection of the statute. What about the Gregory case, where it certainly was dicta, but they said we're inclined to disagree with that rule? Well, I think there was... It's not controlling, but it says that at least three judges weren't so sure that was right. Well, if they were that sure, they would have stated it, had that as the basis for their opinion, and there was no basis for... They didn't have that as the basis for their opinion, so I think there was some hesitation there, or else the judges could have clearly just said that in the opinion. So, I think there was some skepticism. Well, let me suggest to you, for that kind of language to get out, to be left in the opinion, means that they probably felt somewhat strongly about it, but it was totally... They could have just said, we're not going to address this. Correct. But they came out and said, but we do disagree, inclined to disagree with it. That's... In judicial terms, that's... They went out of their way to say it. I understand that, Your Honor. I just don't think it's precedent here. I think that the court can consider this under its own... Under this particular case. No, the Supreme Court said that we have to pay attention to their dicta. That's true. I just... I'm just wondering if we have to pay attention to our dicta. Go ahead. The next question, then, is assuming the court would find that the retention election is a public elective office, then the next question is whether Ms. Heminghouse falls within the public staff exception. And I would urge this court that she does not fall under that exception. As I indicated, the courts, including this court, have narrowly construed that exception, and it's supposed to be narrowly construed against the employer. In the Fifth Circuit Teneyuka case, that court set up a six-factor test to determine whether an employee falls within the personal staff exception. Factor one is whether the elected official has plenary powers of appointment and removal. Certainly, Judge Gertner had that kind of power over Ms. Heminghouse. I believe that's the only factor that weighs in his favor with regard to the six factors. I think the other five factors weigh in her favor. Factor two is whether the person in the position at issue is personally accountable only to that elected official. In this case, Ms. Heminghouse was not. When she did transcripts for attorneys, she was accountable to them for the quality and the timeliness of her work, and that's actually set forth by statute under Missouri Revised Statute 45.050, which sets forth the court reporter's duties. The judge did not . . . Let me . . . a lot of that's in your brief. Let me ask this. The district court did not address this unpredictable matters of the FMLA case, and you know, I may have written the first opinion on it, Spangler, but others have said that . . . what did covered by the FMLA. Now, I know the district court didn't address that, and one, if we were to agree with you, would it go back then, remanded back on that, or should we address whether the circumstances here would even fall under the FMLA? I would say that it should be remanded back to the district court because the district court didn't even reach that decision based on finding that she fell within the exception under the FMLA, so it would be my position that it needs to go back. What would be added? Did you address that to the district court at the time? Yes, we did, and because it's such a highly factual issue, that's the reason why I think it should go back, because it would necessitate a very detailed factual review, but we did . . . both counsel did address that issue to the district court in the summary judgment. Do you want me to address the actual factual issues on the . . . No, you go on in your own order. I certainly want to hear about your First Amendment retaliation claim, too. Okay, all right. I just want to try to briefly go through the rest of the factors on the personal staff exception. To finish up on Factor 2, she was not accountable only to the judge. She was accountable to other attorneys for transcripts. She also filled in for other court reporters in other divisions, and when she did that, she would have been accountable to those judges for the day when she was there. Under Factor 3, it's whether the employee represents the elected official in the eyes of the public. Ms. Heminghouse did not do so. She only did court reporting. There was no evidence that she regularly dealt with the public. She often worked from home, and the courts look at whether the employee is actually representing the official in the eyes of the public. So, for example, in the Owens versus Rush case, that involved a situation where there was an undersheriff who actually filled in for the sheriff when the sheriff was not present, and that's not the kind of employer relationship that we have here. Don't you think that the ... Obviously, court reporters have to prepare their transcripts. Some court reporters pay others to actually do the typing of transcripts, depending on their workload, but don't you think that the status of a court reporter as working in the courtroom with the judge making a verbatim record of the proceedings of the court presided over by the judge really puts the court reporter in an especially close and identifiable position with the judge that employs him or her? I don't think so, because the court reporter's sitting down there taking what's on the record. The court reporter's not talking to anybody. She's not dealing with the public. She's not, probably in very few cases, she's not even mentioned to anybody in the courtroom. The judge doesn't consult with her about what she's taking down and what she's not taking down or telling her how to do her court reporting job, so it's not a situation even where you have a close administrative assistant or where you have a law clerk who is working closely with the judge and is getting his or her duties and telling them, passing confidential sorts of information, or a secretary who's passing the flow of information to and from the judge. This is a court reporter who was in the courtroom taking down what was on the record and left. I mean, I understand that there's a close relationship in the sense that she was part of the staff, but I don't think it's the kind of close relationship that's contemplated by this personal staff exception, and I think that's borne out in looking at each one of the factors, and that's why she falls under certainly the first one, because he had the power to hire and fire. I'm not going to deny that, and that makes there some relationship there, but the other ones of these factors I don't think apply. Well, was she then the functional equivalent of a tape recorder? Yes. The court reporter of this day and age has none of the human attributes of confidentiality, emotional support in some respect. Maybe that day is long gone. I'm thinking back in South Dakota where the court reporter would have to ride with the trial judge a hundred miles to the next court session. Here in this court, and in the state courts here, I suppose, you know, whether a court reporter or a tape recorder shows up doesn't make any difference. Is that your argument? That is my argument. For the price of about a third of a court reporter, you get a tape recorder, and that's the end of it. Well, that is my argument, your honor, and I would say it's not evidence in this case, but I actually work over in St. Clair County and they use tape recordings to record the state court. And I think Alaska has done it for years, or tried, I don't know how it worked out for them. Right, so. But that's not this. When the human is there, does a human, does the fact of this person's humanness embody, well among other things, tape recorders don't go out and publicly criticize prosecutors. I guess we could say that. That's true, your honor. Well, is now that electronics, you could program one to do it. That's true. That's true. I only have a couple minutes left. I'd like to save those for rebuttal. So, thank you, your honor. Thank you. Hey, good morning, Mr. Kopp. Good morning, your honor. May it please the court, Michael Kopp with the Missouri Attorney General's Office for Appellees State of Missouri and Judge Gary Gertner. A Missouri State Court judge has a rule driven ethical obligation to conduct the court's business with integrity and the appearance of impartiality, including as to the actions of the staff he public criticisms of the prosecuting attorney, her workplace discussions of the case that she wanted prosecuted, and her heated threatening exchanges with Judge Gertner regarding that speech, all disrupted and impaired the critical operation of the court. Accordingly, the district court properly found her First Amendment retaliation claim barred. Chief Judge Perry also correctly held that Ms. Hemminghouse's request for leeway to randomly appear for work in the morning at later times was barred under the Family Medical Leave Act because her directly supervised position as Judge Gertner's official court reporter was barred under the personal staff exemption of the Federal Medical Leave Act. And as your honor, Judge Riley pointed out, there's no need for this court to even address that issue if the court were to first reach the issue of whether or not Ms. Hemminghouse was entitled to that leave at the outset. But I'll first address Ms. Hemminghouse's... But her argument is that that's a factual determination, or at least you take her allegations in light most favorable to the plaintiff. But is that something the district court ought to do first, or could we look at that? No, your honor. This court could take up that issue right now because we raised that in our in our appellate brief that as a matter of law, this type of request for leave on the undisputed facts before this court are not that provided by the Federal Medical Leave Act. And when we raised that in our appellate brief, there was absolutely no response in appellant's reply identifying any issue of material fact that would require a remand to the court to determine that issue. And here it's uncontroverted that the request for leave that Ms. Hemminghouse was submitting was a request for what she described as quote, leeway as to her arrival time. She concedes that she was not able to offer Judge Gertner any notice as to when she would need leeway in advance. And that's in the state appendix at 36 and also in Ms. Hemminghouse's own appendix at 127. She also admits that she doesn't know how Judge Gertner would have worked out giving her unplanned and unscheduled leeway in the mornings. And that's again in the record at her appendix at 126 to 127. In sum, she offers no account as to how Judge Gertner as a circuit court judge in a metropolitan court was to manage Ms. Hemminghouse's indefinite, open-ended, unscheduled, and unpredictable requests for leeway in the morning. And again, there was no response in plaintiff's, excuse me, appellant's reply brief presenting any issue of material fact that would require fact finding by the And I'll turn back to the claim under the Family Medical Leave Act, but I'd like to address her First Amendment retaliation claim first. And before I get there, I want to highlight a couple of things about Ms. Hemminghouse's position. She didn't just serve as a court reporter, she served as Judge Gertner's sole official court reporter. And as such, she was a critical core member of Judge Gertner's courtroom team that consisted of the bailiff, Ms. Hemminghouse, and the deputy clerk. If court was going to happen, Ms. Hemminghouse needed to be there. In other words, Judge Gertner did not have a pool of court reporters, just the opposite. By statute, Judge Gertner had the authority to appoint one official court reporter to serve as, quote, the sworn officer, end quote, of his court. And that's provided by statute. In fact, Ms. Hemminghouse was the only employee that Judge Gertner had that type of supervisory authority to appoint and to supervise. Moreover, Ms. Hemminghouse served a critical function to Judge Gertner. If court were on the record, court couldn't open if she were not there to transcribe the proceedings. When jurors and litigants appeared in Judge Gertner's court, it was Ms. Hemminghouse that they observed as Judge Gertner's specific sworn officer of his court and official court reporter. Moreover, I wanted to highlight that this is not an ordinary public employee, employer relationship. A court has a particular and unique demands placed on the judge's conduct and his employee's conduct. Judge Gertner not only had the exclusive authority by statute, but also the ethical duty to supervise his official court reporter in a manner that preserved the court's integrity and appearance of impartiality. And that's by Missouri Supreme Court Rule 2, that judges shall require court staff and other subject to the court's direction and control to act in a manner consistent with the judge's obligations. And those obligations include preserving the court's integrity and appearance of impartiality. Those facts- Let me ask, information may be a little stale, but I used to see these all the time and there was typically a very close relationship to them, but I also saw situations where the court reporter was essentially in a pool. They all were housed down the hallway in a different office space. Does the record here show anything about the working relationship where her office was in relationship to the judge and any of the details of the day-to-day relationship? The record shows and also the law shows that she was not part of a pool. By statute, Judge Gertner has the obligation to appoint one official court reporter. So he is not assigned a pool of court reporters. And that's in the record both as a matter of fact and as a matter of law. And in terms of the nature of their working relationship, it's also as a matter of fact and as a matter of statute that any time the court was in session on record, Ms. Heminghouse was required to be there to transcribe the proceedings. And the statutes that I'm referring to are section 485.040 and section 485.050. So any time the court was in session, as Judge Gertner's official court reporter, she had to be there to transcribe the proceedings. And so this wasn't a situation where he was seeing a different court reporter in his courthouse every day. When people walked into his courthouse, Ms. Heminghouse was his official court reporter. She'd be the one that they would see day in and day out. The record also reflects- I ask you this, this is partly curiosity, but in the federal system as well as the state systems I'm familiar with, any lawyer is entitled to have a court reporter, even in chambers, to record. Now did she do that? Does the record show that she had to be available if the lawyers are meeting in chambers to discuss jury instructions or whatever it might be? Did the court reporter come into chambers, too, when needed? Any matter that would have been on the record, she would have been there to transcribe. So if the parties were holding a matter on the record in chambers, like for example, jury instructions, she would need to be there to transcribe it. If your specific question is, does the record reflect how many times she was in chambers, it does not. But again, any time the court was in session on the record, she would have been serving as his court reporter. And again, it's a very small courtroom team that was there day in and day out. And that's important in terms of Ms. Hemminghouse's First Amendment claim. In that, Judge Gertner had a duty to supervise her employment consistent with the court's obligations. And here, the crux of Ms. Hemminghouse's argument is that her First Amendment claim can proceed because we don't get to the qualified immunity question because Judge Gertner hasn't introduced sufficient evidence of disruption. And the record shows broad-based disruption that was caused by Ms. Hemminghouse's speech towards the prosecutor. And I want to highlight in the record specifically- Are you conceding that it was a matter of public concern, or are you just choosing not to argue that today? We're not arguing that her speech was a matter of public concern. It is clear from the record that Ms. Hemminghouse concedes that she never spoke about any other case other than her own. And so, there was a private interest motivated in that speech. Well, but I think her point is of public concern was to protect the public from this individual. And then also to advise the public that their prosecutors aren't doing their job. Which is a little more beyond her case. But so, anyway, your focus today is not on public concern, yours is on the disruption? That's correct. The focus is on the second part of that Pickering balancing test. So, we're not arguing that her speech was not at least touching upon a matter of concern, such that you have to go to the second test. We do argue that she's conceded that this speech was made primarily in her private interest of getting that case prosecuted. But the crux of our argument is that the Pickering balancing test requires her interest in that public speech to be counterbalanced against the employer's interest in an efficient administration of the workplace. And here, the record evidence shows disruption that clearly implicates the Pickering balancing test. And this court has held repeatedly, when the Pickering balancing test is at play, it will be a rare case where qualified immunity doesn't apply. Because it's nearly impossible for the actors to predict the outcome of that test. And Ms. Heminghouse's argument really boils down to arguing that we haven't presented sufficient evidence of disruption to trigger the Pickering balancing test. Because she recognizes that this law holds that it will be rare when the Pickering balancing test is implicated. That qualified immunity doesn't apply. And here, the record evidence is that Ms. Heminghouse in her own blog post, where she's calling the prosecutor, those MF-ing bastards. Here's one more thing that the F-ing PA has done to slam me to the ground. Again, those MF-ers, I can't believe this. Our lead prosecutor is corrupt to the max. In that very same blog post where she's criticizing the prosecutor, she clearly identifies the disruption of the workplace. On that same blog post, she says, alienated the whole prosecuting attorney's office against me. Further down, she says, alienated the whole courthouse against me. In terms of describing her working relationship with a judge, in that same blog post she reports, the bastard judge I worked for asked me why I didn't when she was saying she wanted to beat up the nanny.  The prosecutor was calling Judge Gertner, telling him that Heminghouse's pursuit of a children's case was harassing, has caused her to be escorted from the police department, and that she was almost arrested. She had an ex parte order of protection entered against her. A senior probate employee testified that Heminghouse made threatening remarks about Judge Gertner. Another employee called Judge Gertner to tell her twice that Ms. Heminghouse's speech of her case was upsetting her. And again, we're not left to wonder whether there was disruption. Heminghouse testifies herself that she called Ms. Nakashima Moran to tell her it was just out of control with the judge. In just the day before her termination, in discussing how her children's case could be prosecuted with Judge Gertner, Ms. Heminghouse admits the following. This is in her sworn interrogatory response. I asked him not to hurt me or my case, and I would not hurt him. Again, the disruption was so high that the official court reporter is threatening to hurt the judge. In her own sworn interrogatory answers, that's identified. Finally, the relationship was so disrupted by the speech that when Judge Gertner attempted to meet with her about that meeting, she refused to meet with him without an attorney monitoring the meeting. It's difficult to imagine a more disrupted working environment with a more impaired working relationship. And Judge Gertner is not required to produce evidence of a workplace reduced to utter chaos. In both Waters versus Churchill, Bailey versus Department of Elementary Education, this court and the Supreme Court have held that when close relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Moreover, we're not required to show that we prevail on this balancing test. Simply that there's enough evidence of disruption, and Judge Gertner's interests are strong enough that the test is invoked, such that it wouldn't be clear to him as a matter of a clearly established constitutional right, that in trying to address that situation, he was violating a constitutional right. I'd like to turn to, and I'd also just like to highlight to the court, the McDaniel versus Woodward 11th Circuit case, which is nearly on all fours, where the judge's secretary had been warned not to get involved in a potential prosecution. And there, the secretary defied that advice, the judge terminated her. And with even less evidence of disruption, the court upheld that, not on qualified immunity, but showed that she hadn't even shown that her interest in speech outweighed the employer's interest in protecting the integrity and the impartiality of the court. I'd like to turn to the FEMLA claim. Aside from the fact that this type of claim is not provided for by FEMLA, her claim is completely barred for an additional reason that she's not covered by the FMLA. Ms. Heminghouse's first point is that Judge Gertner did not hold public elective office. But the fact is that he stood in public general elections on a regular basis in which his position was vulnerable to public ouster. People came in, cast ballots, and if he didn't obtain a majority, he would have been voted out of office. At what point in his career did he become a public elective office holder? The day of his original appointment or after his first retention? The day of his original appointment, because the FLSA, which the FMLA adopts, has a different articulation of that public elective office. It says that the person must hold public elective office. And that's different from Title VII, which says that the officer must be elected to public office. So the US Congress enacted very different language. From the very first day that he stepped into that office, if he wanted to retain that position, he was going to be vulnerable to the public electorate. And I'd also like to point out, just as a factual matter, Judge Gertner was appointed in 2000. And he stood for his first retention election in 2002, and he also stood for a retention election in 2008. So in 2006, when Ms. Hemminghaus was hired, he'd already stood for a retention election and was about to stand for another retention election. And I see that I'm out of time, but I'm happy to answer any additional questions of the panel. I guess not. Thank you. Ms. Polk, how about minute 43? One minute 43 seconds, Your Honor. Okay, thank you. All right, Your Honor, I'll try to address- You can adjust that electorate if you need to. No, I'm fine, I think, as long as you can hear me. A couple of points. One is that there were other court reporters who filled in for Ms. Hemminghaus in Judge Gertner's courtroom when she was not available. So other division court reporters, they would ask each other to fill in if one of them was sick or one of them had to take a personal day or something, so there were other court reporters that would fill in for her. There was also a pool of swing court reporters who would fill in for the division court reporters, including Ms. Hemminghaus, to give them a week or so to work on transcripts. Also, the legislative history of the personal staff exemption that I mentioned in my brief, there's a section in there where one of the legislators talks about that, specifically that stenographers are not, they don't intend stenographers to be included under that exception. With regard to Ms. Hemminghaus' First Amendment claim, on the issue of disruption, I don't think the issue of disruption is as clear as Mr. Kopp makes it sound to be. There was testimony, the judge testified that he never told Ms. Hemminghaus that she was a distraction in the workplace or that she was not letting people get their work done. Gail Crane, who was the unit manager over the 24 or so probate employees, testified that no one in her staff ever complained about Ms. Hemminghaus or had difficulty getting along with her. She did say something about a statement that Ms. Hemminghaus had said that she thought was threatening, but on further probing during her deposition, she said that she really didn't think the comment was important enough to make a note about or even tell the judge about, she just thought that Ms. Hemminghaus was venting. Okay, your time's expired. At what point does disruption become disruption? Well, I don't think it became disruption in this. It has to affect, actually disrupt the workplace. And there just wasn't any evidence that it was disrupting the workplace. That somebody gets irritated or upset is not disruption. Every workplace is going to have people who are irritated or upset. I haven't been in one yet that was like that, that wasn't like that. But I think there has to be at least some evidence showing some real disruption in the office. And there just wasn't that here. Well, you had multiple people complaining to the judge or reporting to the judge about things she was saying and doing, is that disruption? Well, John Evans had testified about an incident where she had some phone contact with the nanny abuser. But that contact was not disruption in the workplace. That was her talking to somebody outside of the workplace. It wasn't disruption in the workplace, it wasn't even with co-workers. And had Mr. Evans not called the judge, the judge wouldn't have even known that the incident had existed. So I don't think that's disruption in the workplace because of that. Is the level of disruption an objective one or subjective? In other words, if it was disruptive in Judge Gertner's mind, isn't that good enough to qualify for qualified immunity? I don't think so. I think the case law says it has to be reasonable- A reasonable judge? Reasonable under the circumstances. So I don't think it's an entirely subjective determination. And the fact that the judge may have reasonably concluded that it was disruptive of the impartiality of his office. Would that not be sufficient evidence? I don't think so because the case law says that the judge has to present substantial evidence of actual disruption. Not a worry about impartiality. There was no evidence- But it cuts against our rules of impartiality. If a reasonable person would have thought the office was no longer impartial, that's the end of the question. But under qualified immunity, there has to be at least some evidence to support that. But just a worry about it is not enough under the qualified immunities cases. Maybe so, maybe no. Okay. Thank you. You're welcome, Your Honor. We thank you for your arguments and we will be back to you as soon as we are able. Thank you.